**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JACKIE S.,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:05-CV-00755** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **JOHN M. CONNELLY,** | : | **Magistrate Judge Kemp** |
| **in his capacity as Executive Director** | : | |
| **of the Ohio Rehabilitation Services** | : | |
| **Commission** | : | |
| | : | |
| **Defendant.** | : | |

**OPINION & ORDER**

**I. INTRODUCTION**

This matter comes before the Court upon the following motions by Defendant, John M.

Connelly ("Defendant"), in his capacity as Executive Director of the Ohio Rehabilitation Services

Commission: (1) Defendant's Second Motion to Dismiss[1] Plaintiffs' Amended Complaint ("the

Amended Complaint"); (2) Defendant's Motion to Dismiss Intervenors' Complaint.  Defendant

asserts that the Court must dismiss Plaintiffs' Complaint and the Intervenors' Complaint both for

lack of subject matter jurisdiction and for failure to state a claim on which relief can be granted

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, respectively.  For

the reasons set forth herein, the Court **GRANTS** Defendant's various Motions to Dismiss for failure

to state a claim on which relief can be granted.

---

[1]Defendant filed a First Motion to Dismiss on October 11, 2005, but Plaintiffs filed an
Amended Complaint in response.  Defendant filed a Second Motion to Dismiss on November 30,
2005.  Accordingly, Defendant's First Motion to Dismiss is now **MOOT** [Doc. No. 2].

## II. STATEMENT OF FACTS

### A. Background

The purpose of Title I of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701-753 (hereinafter "Rehabilitation Act" or "the Act")[2], is to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, inclusion, and integration into society. *See* 29 U.S.C. § 701. Specifically, Title I of the Act is intended to assist States in operating a comprehensive, coordinated, effective, efficient, and accountable program of vocational rehabilitation that is designed to assess, plan, develop, and provide vocational rehabilitation services for individuals with disabilities consistent with their strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice, so that such individuals may prepare for and engage in gainful employment. *See id*. § 720(a)(2). To that end, Congress created an interactive federal-state scheme whereby a state may receive federal funding for its vocational rehabilitation programs if it submits to its Commissioner of the Rehabilitation Services Administration a three-year plan which meets certain federal guidelines. *Id*. § 721(a).

State participation in the program is voluntary, but if a state chooses to participate it must comply with federal guidelines and regulations implementing the Act. *See id*. § 721. Ohio participates in the program, and the Ohio Rehabilitation Services Commission ("ORSC") is the state unit in Ohio designated to provide vocational rehabilitation services to people with disabilities pursuant to Sections 720-753 of Title I of the Rehabilitation Act. *See* OHIO REV. CODE § 3304(D). The Bureau of Vocational Rehabilitation ("BVR" or "the Bureau") is the division of ORSC that

---

[2]Title I of the Rehabilitation Act was last amended effective August 7, 1998, as Title IV of the Workforce Investment Act.

provides rehabilitation services to individuals with disabilities other than blindness or other visual impairments.

Title I of the Rehabilitation Act has thirty-six explicit requirements for state plans, one of which is an individualized plan of employment ("IPE"). *See* 29 U.S.C. § 721(a)(9). Under the terms of the Act, an eligible individual and his vocational rehabilitation counselor must jointly develop and agree to an IPE. *Id*. § 722(b)(1)(A). Each IPE must be designed to achieve that individual's employment objective, long-term rehabilitation goals, and intermediate rehabilitation objectives, "consistent with the unique strengths, resources, priorities, concerns, abilities, and capabilities of the individual." *Id*. § 722(b)(1)(B)(I). If a dispute arises between an individual and his counselor, the individual may exercise his right to an administrative appeal to a BVR supervisor, an impartial hearing officer, and BVR's administrator. *Id*. §§ 722(b)(2)(E), (c)(5).

In May of 2005, ORSC promulgated an administrative rule, O.A.C. § 3304-2-58(H) to limit the amount of financial assistance that it will provide to eligible individuals seeking a post-secondary education. As amended, O.A.C. § 3304-2-58(H) reads:

> (1) The consumer shall apply for financial aid by completing and submitting the free application for federal student aid (FAFSA), when the school participates in federal student aid programs.

> (2) The consumer shall submit a copy of his/her student aid report (SAR) to his/her counselor for each academic year for which RSC is authorizing post-secondary educational training. The EFC [(which stands for Expected Family Contribution)] listed on the SAR shall be used in calculating the consumer's financial need.

> (3) The consumer shall be required to contribute fifty per cent of the EFC for the 2005/2006 academic year, and seventy-five per cent of the EFC for the 2006/2007 academic year, and one-hundred percent of the EFC for each succeeding academic year.

> (4) Consumers who receive supplemental security income (SSI) or social security disability

insurance (SSDI), or those who are excluded pursuant to section 4121.66[3] of the Ohio Revised Code, are provided post-secondary educational training services without applying the financial needs test specified in paragraph (H)(3) of this rule.

(5) The RSC contribution to post-secondary educational expenses shall be computed by subtracting the following from the cost of post-secondary educational expenses: the combined total of all grant monies, comparable benefits, and the percentage of the EFC to be paid by the consumer, as described in paragraph (H)(3) of this rule. All awards and scholarships awarded to the consumer shall be applied to the EFC.

*See* O.A.C. § 3304-2-58(H) (2006).

At the same time, ORSC also amended O.A.C. § 3304-2-58(I) to limit the time permitted for an individual receiving aid pursuant to the Rehabilitation Act to complete each academic year of post-secondary education to a maximum of eighteen consecutive months. As amended, O.A.C. § 3304-2-58(I) reads:

(I) to continue to receiving RSC sponsorship, a consumer shall demonstrate satisfactory progress in accordance with paragraph (B) of this rule and shall have a maximum of eighteen consecutive months to complete each academic year of post-secondary educational training as defined by the degree program. The appropriate area manager and/or designated assistant area manager shall request, with justification, approval from the bureau director and/or his/her designee to extend the time limit.

*See* O.A.C. § 3304-2-58(I) (2006). Together, O.A.C. 3304-2-58(H) and (I) are referred to as the "college training rule."

## B. Procedural History

### 1. Facts Related to Jackie S.

Plaintiff, Jackie S., who suffers from disorders that limit her ability to comprehend and to

---

[3]Section 4121.66 of the Ohio Revised Code provides that, "(A) [t]he administrator of workers' compensation shall pay the expense of providing rehabilitation services, counseling, training, and living maintenance payments from the surplus fund established by section 4123.23 of the Revised Code." *See* OHIO REV. CODE § 4121.66(A).

follow complex instructions, applied for and was made eligible for BVR rehabilitation services on September 14, 2004.  Pls.' Amended Complaint ¶¶ 19, 89.  Jackie S.' father alleges that when he contacted BVR in 2004 to discuss the prospect of his daughter going to college, BVR representatives told him that the Bureau would pay for her college tuition, and that Jackie S., through her family, would be responsible for paying the cost of her books.  *Id.* ¶ 91.  Jackie S.'s father asserts that based on his conversations with BVR, he placed Jackie S. in Youngstown State University, a private secondary school that could accommodate her disability needs, which cost him approximately $15,000 annually.  *Id.* ¶¶ 92, 94.  After ORSC promulgated the amended college training rule, however, Jackie S. was required to contribute 50% of the EFC toward the expenses of her 2005-06 academic year, amounting to $7,500.  *Id.* ¶ 105.  Jackie S.'s father argues that had he known that BVR would not cover Jackie S.'s tuition costs, he would not have sent her to a private school.  *Id.* ¶ 93.  Moreover, Jackie S.'s father asserts that in making its calculations, BVR failed to list Jackie's IPE allowance of $1,000 per year for transportation costs, and that, had it included that amount, BVR would have been required to contribute more money to Jackie S.'s educational expenses.  *Id.* ¶¶ 106-09.

On June 14, 2005, Jackie S.'s father sent a letter to his daughter's BVR counselor asking if there was any provision allowing the counselor to waive the requirements of O.A.C. § 3304-2-58(H) as amended.  Complaint ¶ 110.  The counselor responded by letter on June 23, 2005 that he was unaware of any provision in the college training rule to request a waiver except "to file an appeal." *Id.* ¶ 111.

In late August, Jackie S. learned that Youngstown State University calculates the cost of attendance for a student living at home differently from the manner in which her BVR counselor

calculated her cost of attendance under O.A.C. § 3304-2-58(H).  Complaint ¶ 118.  Accordingly, on

August 28, 2005, she contacted her counselor to request that her IPE be amended to take the

University's calculation methods into account.  *Id*. ¶ 120.  Her request was denied on August 31,

2005, and on that date, a  letter was sent to Defendant on Jackie S.'s behalf requesting an

administrative appeal to challenge the validity of her BVR counselor's decision not to amend her

IPE.  *Id*. ¶¶ 121-22.  By letter, dated September 14, 2005, Defendant, through an agent, sent Jackie

S. a letter denying her request for a hearing.

## 2. The Initial Complaint

In addition to requesting an administrative hearing from BVR, on or about August 10, 2005,

Plaintiff, Jackie S., filed suit against Defendant, John M. Connelly, in his official capacity as

Executive Director of ORSC, seeking relief under Title I of the Rehabilitation Act, its accompanying

regulations as enforced through 42 U.S.C. § 1983, and the Supremacy Clause of the United States

Constitution.  Pl.'s Original Complaint ¶ 1.  In her Complaint, Plaintiff alleged that O.A.C. § 3304-

2-58(H), as amended on or about May of 2005, is contrary to federal statutes and regulations.  *Id*.

¶ 9.  Plaintiff sought to declare said administrative code provision in violation of federal law and

requested both declaratory and injunctive relief against Defendant to prevent ORSC and BVR from

enforcing the newly-adopted regulation.  *Id*.

On or about October 11, 2005, Defendant filed its First Motion to Dismiss Plaintiff's

Complaint for lack of subject matter jurisdiction and failure to state a claim on which relief can be

granted.  In response, Plaintiff filed an Amended Complaint adding named Plaintiffs,[4] Victoria F.,

---

[4]The Plaintiffs appear through pseudonym as their right to confidentiality is guaranteed
by federal regulation found at 34 C.F.R. § 361.38.  Pls.' Amended Complaint ¶ 18.

Mary W., Quinn M., Zach M., and Steven M, to her action.[5]  Shortly thereafter, on November 10, 2005, Plaintiffs filed a Motion for Preliminary Injunction and Interim Class Certification.

## 2. Plaintiffs' Amended Complaint

Plaintiffs' Amended Complaint asserts a class action lawsuit on behalf of themselves and all individuals who have been found eligible or who may in the future be found eligible to receive post-secondary training as a service as part of their individual plans for employment under the vocational rehabilitation provisions of Title I of the Rehabilitation Act.  The representative plaintiffs are people with disabilities who have been found eligible to receive rehabilitation services from ORSC.[6]

Specifically, Plaintiffs challenge the legality of the college training rule, O.A.C. §§ 3304-2-58(H) and (I) under Title I of the Rehabilitation Act and its accompanying regulations, as well as under the Due Process Clause and the Supremacy Clause of the United States Constitution.

## 3. The Parties' Dispute

On or about November 13, 2005, Plaintiffs filed a Motion for Production of the Record of

---

[5]On September 15, 2005, Steven M., Quinn M., and Zach M. were given administrative hearings before an impartial hearing officer pursuant to Section 102 of Title I of the Rehabilitation Act, 29 U.S.C. § 722.  *See* Def.'s Motion to Dismiss at 2.  On November 16, 2005, the officer rendered a decision in favor of BVR, denying each of their claims.  *Id*.

[6]The other named plaintiffs, not including the Intervenors, are as follows: (1) Victoria F., who has received BVR services since 2004 and attends Belmont Technical College in pursuit of her vocational goal of being a medical coder; (2) Mary W., who has received support from BVR since 2003 and has been attending Columbus State Community College with financial support from BVR; (3) Quinn M., who, through her receipt of BVR services, is able to attend college at a reduced rate and is in her third year at the University of Arizona; (4) Zach M., who receives BVR services and is currently enrolled as a sophomore at the Ohio State University; (5) Steven M., who receives BVR services and is in his junior year at the University of Toledo.  *See* Pls.' Amended Complaint ¶¶ 23-48.

Administrative Appeal under Seal, and on November 22, 2005, the Court scheduled a preliminary injunction hearing for December 16, 2005.  On November 30, 2005, Defendant filed his Second Motion to Dismiss Plaintiffs' Amended Complaint.

The parties later reached a settlement agreement with regard to the preliminary injunction issue.  Accordingly, on November 25, 2005, Plaintiffs voluntarily dismissed Count II of their Amended Complaint, which sought to enforce the requirements of Title I of the Rehabilitation Act and its accompanying regulations through 42 U.S.C. § 1983.  Further, on December 6, 2005, Plaintiff, Victoria F., dismissed all of her remaining claims pursuant to Rule 41 in order to proceed with her administrative claims.  The following three causes of action remain.

### a) First Cause of Action - Contribution Requirement and Time Limit of O.A.C. §§ 3304-2-58(H) and (I)Violate Title I of the Rehabilitation Act and its Regulations

Plaintiffs' First Cause of Action asserts that the contribution requirement and the time limit required by the amended Ohio college training rule violate Sections 102 and 103 of Rehabilitation Act (29 U.S.C. §§ 722-23), and its accompanying regulations, specifically, 34 C.F.R. §§ 361.48, 361.50(a) & (c), and 361.54(b).  Pls.' Amended Complaint ¶ 209. Plaintiffs assert that the college training rule is contrary to federal law in that it: (1) fails to consider "*only* the financial situation of eligible plaintiffs"; (2) fails to ensure that the plaintiffs' participation in the cost of vocational rehabilitation services is reasonable; (3) places so high a burden on the plaintiffs seeking to receive vocational rehabilitation training through post-secondary education that it effectively denies a necessary service; (4) places an arbitrary limit on the nature of the vocational services to be provided to the plaintiffs; (5) fails to consider disability-related needs and expenses"; (6) treats similarly situated individuals differently; (7) sets forth no mechanism and criteria for waiver; and (8) uses criteria for measuring financial need that do not reflect current financial circumstances, and thus,

conflicts with Title I of the Rehabilitation Act and its accompany regulations, specifically, 34 C.F.R. §§ 361.48, 361.50(a) & (c), and 361.54(b). *Id*.

### b) Third Cause of Action - O.A.C. §§ 3304-2-58(H) and (I) Conflict with Federal Law and Violate Plaintiffs' Due Process Rights

Plaintiffs allege that Defendant's action, while acting under color of state law, of promulgating and implementing the arbitrary Ohio college training rule, violates the Due Process Clause of the 14th Amendment to the United States as enforced through 42 U.S.C. § 1983.  Pls.' Amended Complaint ¶¶ 216-19.

### c) Fourth Cause of Action - O.A.C. §§ 3304-2-58(H) and (I) Conflict with Federal Law and are Invalid via Operation of the Supremacy Clause of the United States Constitution

Plaintiffs assert that because the college training rule violates Sections 102 and 103 of Title I of the Rehabilitation Act (29 U.S.C. §§ 722-23), and its accompanying regulations, specifically, 34 C.F.R. §§ 361.48, 361.50(a) & (c), and 361.54(b), and because the rule stands as an obstacle to the accomplishment and execution of the "full purposes and objectives of Congress as set forth in [Title I of the] Rehabilitation Act," the rule is preempted by federal law, and is invalid pursuant to the Supremacy Clause of the United States Constitution.  Pls.' Amended Complaint ¶¶ 220-23

### d) Requested Relief

Plaintiffs ask the Court for the following relief.  First, they request that the Court issue an order declaring both O.A.C. §§ 3304-2-58(H) and (I) to be in violation of Plaintiffs' rights under Title I of the Rehabilitation Act and invalid under the Supremacy Clause of the United States Constitution.  Pls.' Amended Complaint at 33.  Further, Plaintiffs ask the Court to enjoin prospectively Defendant from failing to provide services to the class members in accordance with the Provisions of the Ohio Administrative Code that were in effect prior to the passage of the college

training rule in May, 2006, until such time as the Defendant may promulgate a regulation in conformity with federal law.  *Id*.  Finally, the Plaintiffs request their costs and reasonable attorney's fees, and any other relief as the Court shall deem reasonable and proper.  *Id*.

### 4. The Intervenors

On December 9, 2005, Applicants, Dan R., Craig V., David S., and Joshua B. (collectively "Intervenors")[7] filed a motion to intervene, which the magistrate judge granted on February 17, 2006.  Defendant filed its First Motion to Dismiss Intervenors' Complaint on January 19, 2006.

On April 27, 2006, the Court granted Defendant's Motion to Stay Consideration of Plaintiff's Motion for Class Certification pending its decision on both Defendant's Second Motion to Dismiss Plaintiffs' Amended Complaint and Defendant's Motion to Dismiss Intervenors' Complaint.  The Defendant's various motions to dismiss are now ripe for review.

### III. STANDARD OF REVIEW

### A. Dismissal For Lack of Subject Matter Jurisdiction

Where a defendant raises the issue of lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff has the burden of proving jurisdiction in order to survive the motion to dismiss.  *DXL, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004); *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  A

---

[7]According to their Class Action Complaint, BVR informed each of the Intervenors that due to the college training rule, it would no longer contribute to their college education.  *See* Intervenors' Complaint ¶¶ 2-5.  The Intervenors have all filed timely administrative appeals to BVR's treatment of their cases, and the appeals were all denied by the Hearing Officer on December 1, 2005.  *Id*. ¶ 6.

facial attack is a challenge to the sufficiency of a complaint, and, when considering the motion, the court must view the material allegations of that complaint as true and construe them in the light most favorable to the nonmoving party.  *Id*.  A factual attack is a challenge to the factual existence of subject matter jurisdiction.  *Id*.  No presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and to satisfy itself as to the existence of its power to hear the case.  *Id.*; *Moir*, 895 F.2d at 269.  When there is an attack on the factual basis for jurisdiction, the district court must weigh the evidence, and the plaintiff has the burden of proving that the court has jurisdiction over the subject matter.  *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005).

### B. Dismissal for Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) is designed to test "whether a cognizable claim has been pleaded in the complaint."  *Scheid v. Fanny Farmer Candy Shops, Inc.* 859 F.2d 434, 436 (6th Cir. 1988).  In considering such a motion, the Court is limited to evaluating whether a plaintiff's complaint sets forth allegations sufficient to make out the elements of a cause of action.  *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir. 1983).  Dismissal under Rule 12(b)(6) streamlines litigation by "dispensing with needless discovery and fact-finding" on claims that are legally untenable in the first place.  *See Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989).

All factual allegations made by a plaintiff are deemed admitted and ambiguous allegations must be construed in his favor.  *Murphy v. Sofamor Danek Gp., Inc.,* 123 F.3d 394, 400 (6th Cir. 1997).  A complaint should not be dismissed under Rule 12(b)(6) "'unless it appears beyond doubt that the [p]laintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While the complaint need not specify every detail of a plaintiff's

-11-

claim, it must give the defendant "'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994) (quoting *Conley*, 355 U.S. at 47).

This liberal standard of review does require more than the bare assertion of legal conclusions. *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993) (citation omitted). Under the federal pleading requirements, a plaintiff's complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* FED. R. CIV. PRO. 8(a)(2). The short and plain statement must "give the defendant fair notice of what plaintiff's claim is, and the grounds upon which it rests." A complaint must contain either direct or inferential allegations with respect to all the material elements necessary to sustain a recovery under some viable legal theory. *Id.* (citations omitted).

### IV. ANALYSIS[8]

#### A. Whether This Court May Exercise Jurisdiction Over Plaintiffs' Claims

##### 1. Whether 11th Amendment Immunity Precludes this Court from Exercising Jurisdiction Over Plaintiffs' Claims for Relief

The Eleventh Amendment provides, "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend XI. As originally drafted, the suits to which the Eleventh Amendment referred were only those which were brought against a state by out-of-state or foreign citizens; however, in 1890, the

---

[8]Because Defendant's arguments in support of its Motion to Dismiss Plaintiffs' Amended Complaint are almost identical to its arguments in support of its Motion to Dismiss Intervenors' Complaint, the Court will consider these two motions in tandem. Named Plaintiffs and Intervenors are hereafter referred to collectively as "Plaintiffs."

Supreme Court held that the amendment barred both in-state as well as out-of-state citizens from suing a state. *See Hans v. Louisiana*, 134 U.S. 1 (1890). Under current law, therefore, the Amendment is a bar to federal court jurisdiction whenever any private citizen attempts to sue a state. *Id.*

There are, however, three qualified exceptions to Eleventh Amendment immunity. *See Lawson v. Shelby Cty*, 211 F.3d 331, 334-35 (6th Cir. 2000) (discussing exceptions to the Eleventh Amendment). First, a state may waive the protection of the Amendment by consenting[9] to the suit. *Id.* Second, Congress, under certain provisions of the Constitution, may abrogate the sovereign immunity of the states through statute. *Id.* at 334. Third, a federal court may enjoin a "state official" from violating federal law. *Ex parte Young,* 209 U.S. 123 (1908) (holding that the Eleventh Amendment does not bar a suit against a State official for prospective injunctive relief).[10]

Plaintiffs assert that they "proceed here primarily under the doctrine of *Ex parte Young*," and that the action may proceed because they have sued Defendant in his official capacity and seek no

---

[9]Consent may occur in a number of ways. *Lawson*, 211 F.3d at 334. For instance, a state may expressly waive immunity from suit for money damages in court. *See Thiokol Corp. v. Dept. of Treasury*, 987 F.2d 376 (6th Cir.1993). Consent may also take the form of a voluntary appearance and defense on the merits in federal court. *See Clark v. Barnard,* 108 U.S. 436 (1883). Furthermore, consent may result when the state agrees to administer a federal-state program that imposes certain federal standards upon the state. *Lawson*, 211 F.3d at 334.

[10]In *Ex parte Young*, the Minnesota attorney general had threatened to institute civil or criminal enforcement proceedings against various railroad companies in state court if they failed to comply with state statutes that set a ceiling on the rates they could charge. 209 U.S. 129-31. Prior to commencement of any state enforcement action, however, company stockholders filed suit against the attorney general in federal court seeking to enjoin enforcement of the state statutes on the grounds that they conflicted with the Fourteenth Amendment. *Id.* The Court held that the plaintiffs' complaint gave rise to federal question jurisdiction. *Id.* at 143-45. Accordingly, *Young* established that the Eleventh Amendment does not block a plaintiff's claim for injunctive relief against a state officer to prevent the enforcement of a state statute that allegedly conflicts with the Fourteenth Amendment. *Id.*

retroactive monetary relief.  *See* Pls.' Response at 3.  *Id*.  Defendant, however, relies on the Supreme

Court's reasoning in *Seminole Tribe of Florida v. Florida* to argue that *Ex parte Young* is

inapplicable in this case because the remedial scheme laid out by Congress under 29 U.S.C. §

722(c)(5), (A)-(J) already provides an exclusive remedy for cases brought under Title I of the

Rehabilitation Act.  517 U.S. 44 (1996); Def.'s Motion to Dismiss at 5.

 In *Seminole Tribe*, the United States Supreme Court held that an *Ex parte Young* action was

not appropriate in light of the comprehensive remedial scheme provided in the Indian Gaming

Regulatory Act ("IGRA").  *See* 517 U.S. at 72.  Where a court finds that a state breached its

statutory duty to negotiate in good faith with a Native American tribe, IGRA provides for forced

mediation between the parties with the prospect of federal regulation in the event of an impasse.  *See*

*id*. at 74-75.  According to the Supreme Court, this "quite modest set of sanctions . . . evidenced

Congress' intent to limit the States' exposure for violations of the statute, while, in contrast, an *Ex*

*parte Young* action would leave the states vulnerable to "the full remedial powers of a federal court."

*Id*. at 75.  Accordingly, the Court held that an *Ex parte Young* action is not appropriate in a Native

American tribe's efforts to enforce IGRA.  *Id*. at 76.

 Since issuing its opinion in *Seminole Tribe*, however, the Supreme Court has limited its

holding and foreclosed *Ex parte Young* actions in cases where the remedial scheme available under

the statute in question is sufficiently specific.  Most recently, in *Verizon Maryland, Inc. v. Public*

*Serv. Commission of Maryland*, the Court held that Telecommunications Act of 1996 did not

foreclose an *Ex parte Young* action.  535 U.S. 635, 647 (2002).  The Court noted that though the

Telecommunications Act provides that an aggrieved party may sue in federal court to challenge

certain determinations made by state commissions, it does not identify the proper party to be sued,

nor does it restrict in any way the kinds of relief available. *Id*. at 647. The Court explained that merely authorizing federal courts to review commission decisions under the statute does not "impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young*." *Id*. at 647-48.

Defendant asserts that as in *Seminole Tribe* where Congress entitled plaintiff Native American tribes' remedies to be limited to those available under the plain language of IGRA, in this case, where Plaintiffs seek to change Ohio's available vocational rehabilitation services, Congress intended Plaintiff's available relief to be limited to the remedial scheme laid out in 29 U.S.C. §§ 722(c)(5)(A)-(J).[11]   Though this narrow issue is one of first impression in the federal

_____

[11]29 U.S.C. §§ 722(c)(5)(A)-(J) reads:

(c) Procedures
        (5) Hearings
                (A) Officer
                A due process hearing described in paragraph (2) shall be conducted by an
                impartial hearing officer who shall issue a decision based on the
                provisions of the approved State plan, this chapter (including regulations
                implementing this chapter), and State regulations and policies that are
                consistent with the Federal requirements specified in this subchapter.  The
                officer shall provide the decision in writing to the applicant or eligible
                individual, or, as appropriate, the applicant's representative or individual's
                representative, and to the designated State unit.

                (B) List
                The designated State unit shall maintain a list of qualified impartial
                hearing officers who are knowledgeable in laws . . .

                (C) Selection
                Such an impartial hearing officer shall be selected to hear a particular case
                relating to a determination –
                        (i) on a random basis; or
                        (ii) by agreement between –
                                (I) the Director of the designated State unit and the
                                individual with a disability or

-15-

(II) in appropriate cases, the Director and the individual's representative.

(D) Procedures for seeking review

A state may establish procedures to enable a party involved in a hearing under this paragraph to seek an impartial review of the decisions of the hearing officer . . . by –

(i) the chief official of the designated State agency if the State has established both a designated State agency and a designated State unit under section 721(a)(2) of this title; or
(ii) an official from the office of the Governor.

(E) Review request

If the state establishes impartial review procedures under subparagraph (D), either party may request the review of the decision of the hearing officer within 20 days after the decision.

(F) Reviewing official

The reviewing official described in subparagraph (D) shall –

(i) in conducting the review, provide an opportunity for the submission of additional evidence and information relevant to a final decision concerning the matter under review
(ii) not overturn or modify the decision of the hearing officer, or part of the decision, that supports the position of the applicant or eligible individual unless the reviewing official concludes, based on clear and convincing evidence, that the decision of the impartial hearing officer is clearly erroneous on the basis of being contrary to the approved State plan, this chapter (including regulations implementing this chapter) or any State regulation or policy that is consistent with the Federal requirements specified in this subchapter;
(iii) make a final decision with respect to the matter in a timely manner and provide such decision in writing to the applicant or eligible individual, or, as appropriate, the applicant's representative . . . and to the designated State unit, including a full report of the findings and the grounds for such decision; and
(iv) not delegate the responsibility for making the final decision to any officer or employee of the designated State unit.

(G) Finality of hearing decision

A decision made after a hearing under subparagraph (A) shall be final, except that a party may request an impartial review if the State has established procedures for

courts, other courts have previously considered whether the Eleventh Amendment bars plaintiffs

from bringing claims pursuant to *section 504* of Title I of the Rehabilitation Act (29 U.S.C. § 794).

*See, e.g., Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005);

*see also, Doe v. Sylvester*, 2001 WL 1064810 (Del. 2001).

     In *Constantine*, the Fourth Circuit held that the language of Rehabilitation Act did not

---

such review under subparagraph (D) and a party involved in a hearing may bring a civil action under subparagraph (J).

(H) Finality of review
A decision made under subparagraph (F) shall be final unless such a party brings a civil action under subparagraph (J).

(I) Implementation
If a party brings a civil action under subparagraph (J) to challenge a final decision of a hearing officer under subparagraph (A) or to challenge a final decision of a State reviewing official under subparagraph (F), the final decision involved shall be implemented pending review by the court.

(J) Civil Action
    (i) In general
Any party aggrieved by a final decision described in subparagraph (I), may bring a civil action for review of such decision.  The action may be brought in any State court of competent jurisdiction or in a district court of the United States of competent jurisdiction without regard to the amount in controversy.
(ii) Procedure
In any action brought under this subparagraph, the court –
    (I) shall receive the records relating to the hearing under subparagraph (A) and the records relating to the State review under subparagraphs (D) through (F), if applicable;
    (II) shall hear additional evidence at the request of a party to the action; and
    (III) basing the decision of the court on the preponderance of the evidence, shall grant such relief as the court determines to be appropriate.

*See* 29 U.S.C. §§ 722(c)(5)(A)-(J).

suggest a congressional intent to foreclose an *Ex parte Young* action for a violation of 29 U.S.C. § 794. *See* 411 F.3d at 497. The Court explained that the plain language of the Rehabilitation Act makes available all of the "remedies, procedures and rights" provided in Title VI of the Civil Rights Act, which, in turn, forbids discrimination on the basis of race, color or national origin by any "program or activity" receiving federal funding. *See id.* (citing 29 U.S.C. § 794(a)(2)); *see* 42 U.S.C. § 2000d. The *Constantine* court also noted that "Title VI mentioned no remedies" at all, and "it certainly does not purport to limit the remedies available in a suit against a defendant other than a State." *Id.* at 497-98. Further, in *Doe v. Sylvester,* the court reasoned that allowing *Ex Parte Young* claims under Title II of the ADA or Section 504 of the Rehabilitation Act (29 U.S.C. § 794) "does not raise the concerns of judicial over-reaching that were presented by the Supreme Court in *Seminole Tribe*" because, as in *Verizon Maryland*, the statutes at issue both have "broad remedial schemes that were left unspecified by Congress." *See* 2001 WL 106810, at *4-5.

This Court finds that Section 102 of the Rehabilitation Act (29 U.S.C. § 722) does not foreclose an *Ex parte Young* action. The remedial scheme laid out in 29 U.S.C. §§ 722(c)(A)-(J) is distinguishable from that at issue in *Seminole Tribe*. First, the scheme set forth in the Rehabilitation Act is much broader than that contained in IGRA, which outlines intricate procedures that a Native American tribe must follow for enforcement. Though the Act provides that each State must develop procedures to allow an applicant to obtain mediation and/or administrative hearing before seeking judicial review, it does not specify the ways in which a State must implement the foregoing procedural process. *See id.* § 722(c)(1). In contrast, under IGRA, before an Indian Tribe can sue a State for failing to conduct the good-faith negotiation required to develop a Tribal-State compact, it must follow a number of complex procedures, all of which are expressly provided by Congress,

-18-

and from which state procedures cannot deviate.[12]

Second, in allowing for judicial review of a hearing officer's decision, the Rehabilitation Act does not restrict the relief that a court may provide. *See* 29 U.S.C. § 722(c)(J). IGRA, in contrast, specifically limits the judicial relief available to an Indian Tribe. *See* 25 U.S.C. § 2710(d)(3). Under IGRA, a court can only intervene in one of three ways: (1) by issuing an order directing the State to negotiate; (2) by requiring a State to submit to mediation; or (3) by ordering that the Secretary of the Interior be notified to intervene. *See id*.; *see Verizon Maryland*, 535 U.S. at 647 (describing *Seminole Tribe*, 517 U.S. at 44). Hence, where the *Seminole Tribe* court determined that IGRA's "quite modest set of sanctions" displayed an intent not to provide the "more complete and more

---

[12]Before an Indian Tribe may sue a state for failing to comply with IGRA it must comply with the following procedural requirements:

> A tribe that brings an action under Section 2710(d)(7)(A)(i) must show that no Tribal-State compact has been entered and that the State failed to respond in good faith to the tribe's request to negotiate. 25 U.S.C. § 2710(d)(7)(A)(i)). The burden then shifts to the State to prove that it did negotiate in good faith. *Id*. § 2710(d)(7)(B)(ii). If the district court concludes that the State has failed to negotiate in good faith toward the formation of a Tribal-State compact, then it "shall order the State and Indian Tribe to conclude such a compact within a 60-day period." *Id*. § 2710(d)(7)(B)(iii). Thereafter, if no compact is concluded in 60 days, "the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." *Id*. § 2710(d)(7)(B)(iv). The mediator chooses from between the two proposed compacts, the one "which best comports with the terms of [the Act] and any other applicable Federal law and with the findings and order of the court," and submits it to the State and the Indian tribe. *Id*. § 2710(d)(7)(B)(v). If the State consents to the proposed compact within 60 days of its submission by the mediator, then the proposed compact is "treated as a Tribal-State compact entered into under paragraph (3)." *Id*. § 2710(d)(7)(B)(vi). If, however, the state continues to refuse to consent to the compact, then the Act provides that the mediator "shall notify the Secretary [of the Interior]" who shall "prescribe . . . procedures . . . under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction. *Id*. § 2710(d)(7)(B)(vii).

*See Seminole Tribe*, 517 U.S. at 50 (summarizing IGRA).

immediate relief" that would otherwise be available under *Ex parte Young*, the Rehabilitation Act leaves open the possibility that an applicant could sue a state officer directly. *See Verizon Maryland*, 535 U.S. at 647 (describing *Seminole Tribe*, 517 U.S. at 44).

Finding *Seminole Tribe* distinguishable, therefore, the Court holds that the plain language of the Rehabilitation Act does not foreclose a putative plaintiff's potential avenues of relief. Hence, *Ex parte Young* is applicable to this case, and the doctrine of sovereign immunity does not bar Plaintiffs' suit against Defendant.

### 2. Whether Plaintiffs' Claims Must be Dismissed for their Failure to Exhaust the Administrative Remedies Available Under Title I of the Rehabilitation Act

Defendant also argues that should the Court find that the Eleventh Amendment does not bar Plaintiffs' suit, the Court still has no jurisdiction over the case because Plaintiffs have failed to exhaust the administrative remedies available to them under 29 U.S.C. § 722. Plaintiffs, however, assert that the Court should excuse exhaustion as a futile, inadequate way for Plaintiffs to protect their rights. Further, Plaintiffs contend that should this Court require such exhaustion, because Steven M., Quinn M., Zach M., and the Intervenors all sought timely administrative review of their claims, the only result would be that *two* of the named Plaintiffs (Jackie S. and Mary W.) would be denied their statutory claim under 29 U.S.C. § 722(c), so that Plaintiffs' Complaint would not be dismissed *in toto*. *Id*.

There are exceptions to the exhaustion requirement, and "the party who is seeking to avoid exhaustion bears the burden of showing that one of these narrow exceptions applies." *See Honig*, 484 U.S. at 327. For instance, "[e]xhaustion [of administrative remedies] is not required if it would be futile or inadequate to protect the plaintiff's rights." *Honig v. Doe*, 484 U.S. 305, 326-27 (1988); *see also, Covington v. Knox Cty. Sch. Sys.*, 205 F.3d 912, 917 (6th Cir. 2000). As the court noted

in *Urban v. Jefferson Cty. Sch. Dist. R-1*, "administrative remedies are generally futile or inadequate when plaintiffs allege 'structural or systemic failure and seek systemwide reforms.'" *See* 89 F.3d 720 (10th Cir. 1996); *see also, Hoeft v. Tuscon Unified Sch. Dist.*, 967 F.2d 1298, 1309 (9th Cir. 1992) ("[a]dministrative remedies are generally inadequate where structural, systemic reforms are sought"); *see also, Assoc. for Cmty. Living in Colorado v. Romer*, 992 F.2d 1040, 1044 (10th Cir. 1993) (quoting H.R. Rep. No. 296, 99th Cong., 1st Sess. at 7 (1985) (finding that exhaustion is not required when "an agency has adopted a policy or pursued a practice of general applicability that is contrary to law")).

*New Mexico Ass'n for Retarded Citizens v. New Mexico* is an example of a case in which systemic discrimination rendered exhaustion of administrative remedies futile. *See* 678 F.2d 847, 851 (10th Cir. 1982). In *New Mexico Ass'n*, plaintiffs sued the State of New Mexico under Section 504 of the Rehabilitation Act alleging "that the entire special education service system offered by the State [was] infirm." *Id*. The Tenth Circuit held that the plaintiffs were not required to exhaust their administrative remedies before bringing their civil action because "the remedies offered at the administrative level -- primarily reassignment of students within existing programs -- d[id] not include a restructuring of the State's system to comply with Section 504 as sought by the class in this case." *Id*.

*John Doe v. State of Ohio* is also instructive on the exhaustion issue. *See* Case No. 2:91-cv-464, July 9th, 2004 Memorandum and Order (Holschuh, J.) ("*Doe* Memo & Order"). In *Doe*, plaintiffs, parents and teachers of disabled students, sued the State of Ohio pursuant to the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act, and the Americans with Disabilities Act ("ADA"), requesting both a declaration that the system of funding and

-21-

providing services to students with disabilities did not comply with state and federal law and an order requiring the state to establish a system in compliance with such laws. *Doe* Memo & Order at 8. The *Doe* court held that plaintiffs need not exhaust their administrative remedies because there was "no meaningful administrative enforcement mechanism for the type of relief sought." *Id*. at 9. The court explained that it would be futile to require the named plaintiff to exhaust all of his administrative remedies before filing a complaint because the remedies he sought in federal court "[we]re not available in the administrative hearing and appeals process . . . [which was] limited to a review of decisions concerning the identification, evaluation, or education placement of a particular child, and to decisions concerning the provision of education or related services to the child . . ." *Id*. at 12-13.

In this case, the Court finds that, as in *New Mexico Ass'n for Retarded Citizens* and *Doe*, it would be futile for Plaintiffs to exhaust their administrative remedies before bringing a claim in federal court. *See* 678 F.2d 847, 851; *see Doe* Memo & Order. Plaintiffs do not seek to change the way the college training rule is applied to each individual; they want to eliminate the rule outright. Thus, Plaintiffs cannot achieve their requested relief through pursuing their available administrative remedies because an ORSC hearing officer overseeing a party's individual appeal is unable to issue an injunction or grant a declaratory judgment to render O.A.C. §§ 3304-2-58(H) and (I) invalid. Therefore, despite the fact that some of the Plaintiffs have failed to exhaust their available administrative remedies, this Court may exercise jurisdiction over Plaintiffs' claims.

### B. Whether Plaintiffs' Have Stated a Claim on Which Relief Can Be Granted

Finding that the Court may exercise jurisdiction over Plaintiffs' claims, the Court must now consider whether Plaintiffs have stated a claim on which relief can be granted. Defendant argues that

Plaintiffs have failed to state a claim upon which relief can be granted because: (1) the Rehabilitation Act contains no express cause of action through which Plaintiffs can state a claim for systemic relief; (2) the remedial scheme in 29 U.S.C. § 722 creates a presumption against an implied cause of action for systemic relief; and (3) the federal regulations cited by Plaintiffs do not create an express cause of action. *See* Def.'s Motion at 10-15. Plaintiffs assert, however, that 29 U.S.C. § 722 provides an *express* cause of action for claims asserting systemic violations, and that, accordingly, Plaintiffs' claim must survive Defendant's motion to dismiss. *See* Pls.' Response at 11 (emphasis added). The Court will analyze all three of Plaintiffs' causes of action separately to determine their viability.

### 1. Plaintiffs' First Cause of Action - Whether Plaintiffs Have Stated a Claim that the Contribution Requirement and Time Limit of O.A.C. §§ 3304-2-58(H) and (I)Violate Title I of the Rehabilitation Act and its Regulations

Plaintiffs' First Cause of Action asserts that the contribution requirement and the time limit required by the college training rule violate 29 U.S.C. §§ 722-23, and their accompanying regulations, specifically, 34 C.F.R. §§ 361.48, 361.50(a) & (c), and 361.54(b).[13] Pls.' Amended

---

[13]The regulations Plaintiff cite read, in relevant part, as follows:

**34 C.F.R. § 361.48 - Scope of vocational rehabilitation services for individuals with disabilities.** As appropriate to the vocational rehabilitation needs of each individual and consistent with each individual's informed choice, the designated State unit must ensure that the following vocational rehabilitation services are available to assist the individual with a disability in preparing for, securing, retaining, or regaining an employment outcome that is consistent with the individual's strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice:

   (a) Assessment for determining eligibility and priority for services by qualified personnel. . .

   (b) Assessment for determining vocational rehabilitation needs by qualified personnel . . .

(c) Vocational rehabilitation counseling and guidance, including information and support services to assist an individual in exercising informed choice . . .

(d) Referral and other services necessary to assist applicants and eligible individuals to secure needed services from other agencies . . .

(e) . . . physical and mental restoration services, to the extent that financial support is not readily available from a source other than the designated State unit . . .

(f) Vocational and other training services, including personal and vocational adjustment training, books, tools, and other training materials, except that no training or training services in an institution of high education (universities, colleges, community or junior colleges, vocational schools, technical institutes, or hospital schools of nursing) may be paid for with funds under this part unless maximum efforts have been made by the State unit and the individual to secure grant assistance in whole or in part from other sources to pay for that training.

(g) Maintenance . . .

(h) Transportation in connection with the rendering of any vocational rehabilitation service . . .

(i) Vocational rehabilitation services to family members . . . of an applicant or eligible individual if necessary to enable the applicant or eligible individual to achieve an employment outcome.

(g) Interpreter services . . .

(k) Reader services, rehabilitation services, and orientation and mobility services for individuals who are blind.

(l) Job-related services, including job search and placement assistance, job retention services, follow-up services, and follow-along services.

(m) Supported employment services . . .

(n) Personal assistance services . . .

(o) Post-employment services . . .

(p) Occupational licenses, tools, equipment, initial stocks, and supplies.

(q) Rehabilitation technology . . . including vehicular modification, telecommunications, sensory, and other technological aids and devices.

(r) Transition services. . .

(s) Technical assistance and other consultation services to conduct market analyses, develop business plans, and otherwise provide resources, to the extent those resources are authorized to be provided through the statewide workforce investment system, to eligible individuals who are pursuing self-employment or telecommuting or establishing a small business operation as an employment outcome.

(t) Other goods and services determined necessary for the individual with a disability to achieve an employment outcome.

*See* 34 C.F.R. § 361.48.

### 34 C.F.R. § 361.50 - Written policies governing the provision of services for individuals with disabilities.

(a) Policies.  The State unit must develop and maintain written policies covering the nature and scope of each of the vocational rehabilitation services specified in § 361.48 and the criteria under which each service is provided.  The policies must ensure that the provision of services is based on the rehabilitation needs of each individual as identified in that individual's IPE and is consistent with the individual's informed choice.  The written policies may not establish any arbitrary limits on the nature and scope of vocational rehabilitation services to be provided to the individual to achieve an provisions. . .
(c) Payment for services.
    (1) The State unit must establish and maintain written policies to govern the rates of payment for all purchased vocational rehabilitation services.
    (2) The State unit may establish a fee schedule designed to ensure a reasonable cost to the program for each services, if the schedule is –
        (i) Not so low as to effectively deny an individual a necessary service; and
        (ii) Not absolute and permits exceptions so that individual needs can be addressed.
    (3) The State unit may not place absolute dollar limits on specific service categories or on the total services provided to an individual.

34 C.F.R. §§ 361.50(a) and (c).

### 34 C.F.R. § 361.54 - Participation of individuals in cost of services based on financial

**need.**

(a) No Federal requirement.  There is no Federal requirement that the financial need of individuals be considered in the provision of vocational rehabilitation services.

(b) State unit requirements.
    (1) The State unit may choose to consider the financial need of eligible individuals or individuals who are receiving services through trial work experiences . . . or during an extended evaluation . . . for purposes of determining the extent of their participation in the costs of vocational rehabilitation services, other than those services identified in paragraph (b)(3) of this section.
    (2) If the State unit chooses to consider financial need–
        (i) It must maintain written policies–
            (A) Explaining the method for determining the need of an eligible individual; and
            (B) Specifying the types of vocational rehabilitation services for which the unit has established a financial needs test;
        (ii) The policies must be applied uniformly to all individuals in similar circumstances;
        (iii) The policies may require different levels of need for different geographic regions in the State, but must be applied uniformly to all individuals within each geographic region; and
        (iv) The policies must ensure that the level of an individual's participation in the cost of vocational rehabilitation services is–
            (A) Reasonable;
            (B) Based on the individuals' financial need, including consideration of any disability-related expenses paid by the individual; and
            (C) Not so high as to effectively deny the individual a necessary service.
    (3) The designated State unit may not apply a financial needs test, or require the financial participation of the individual–
        (i) As a condition for furnishing the following vocational rehabilitation services:
            (A) Assessment for determining eligibility and priority for services . . . except those non-assessment services that are provided to an individual with a significant disability during either an exploration of the individual's abilities, capabilities, and capacity to perform in work situations through the use of trial work experiences . . .
            (B) Assessment for determining vocational rehabilitation needs. . .
            (C) Vocational rehabilitation counseling and guidance. . .
            (D) Referral and other services . . .

-26-

Complaint ¶ 209.  *See supra* Part II..B.3.a.  Defendant counters that Plaintiffs' claim fails because

neither Sections 722 and 723, nor the federal regulations promulgated thereby includes an *express*

or an *implied* cause of action upon which Plaintiffs may rely.  Def.'s Motion at 10.

### a. Existence of an Express Cause of Action

Though the Sixth Circuit has yet to rule on the issue, other courts have previously held that

29 U.S.C. § 722 does not create an *express* private right of action for a plaintiff seeking individual

relief under Title I of the Rehabilitation Act.  *See Mallett v. Wisconsin Div. of Vocational Rehab.*,

130 F.3d 1245 (7th Cir. 1997) (finding no evidence to support plaintiff's contention that 29 U.S.C.

§ 722 contained either an express or an implied right of action and noting that Title I of the

Rehabilitation Act already provides for an administrative review process to resolve disputes arising

between vocational rehabilitation counselors and recipients); *Johnson-Lloyd v. Vocational Rehab.*

*Office, Pennsylvania Dept. of Labor & Indus.*, 813 F. Supp. 1120 (E.D. Penn.1993) ("Title I of the

[Rehabilitation] Act contains no express provision granting a private right of action to a handicapped

individual who is denied services under a rehabilitation program . . ."); *Jones v. Illinois Dep't of*

*Rehab. Servs.*, 504 F. Supp. 1244 (N.D. Ill. 1981), *aff'd by,* 689 F.2d 724 (7th Cir. 1982)) (deaf

---

(E) Job-related services . . .
(F) Personal assistance services. . .
(G) Any auxiliary aid or services (e.g. interpreter services . . .)
That an individual with a disability requires under Section 504 of
the Act (29 U.S.C. § 794) or the Americans with Disabilities Act
(42 U.S.C. § 12101, *et seq*.), or regulations implementing those
laws, in order for the individual to participate in the VR program
as authorized under this part; or
(ii) As a condition for furnishing any vocational rehabilitation service if the
individual in need of the service has been determined eligible for Social Security
benefits under Title II or XVI of the Social Security Act.

34 C.F.R. § 361.54.

plaintiff suing the Illinois Department of Rehabilitation Services for its alleged failure to provide

for him with interpreter services had no private right of action under Title I of the Rehabilitation

Act); *Ryans v. New Jersey Comm'n for the Blind & Visually Impaired*, 542 F. Supp. 841 (D.N.J.

1982) (finding that Title I of the Rehabilitation Act contains no express provision authorizing an

aggrieved consumer to institute a court action to enforce the Act's provisions).

        In 1998, Congress amended Title I of the Rehabilitation Act, adding 29 U.S.C. §

722(c)(5)(J), a clause providing relief for individuals contesting the findings of their assigned

hearing officer by way of a private civil action. *See* 29 U.S.C. § 722(c)(5)(J) ("[a]ny party aggrieved

by a final decision described in subparagraph (I), may bring a civil action for review of such

decision. . ."). In their Response, Plaintiffs suggest that because each of the above decisions was

decided prior the 1998 amendments, they should not be read to limit Plaintiffs' rights under the Act

as amended. *See* Pls.' Response at 10. The Court, however, finds Plaintiffs' arguments spurious.

Since Congress drafted the 1998 amendments to Title I of the Rehabilitation Act, neither *Mallett*,

*Johnson-Lloyd*, *Jones*, nor *Ryan* has been overruled. Further, either before or after 1998, no court

has ever read Title I of the Rehabilitation Act to create an express cause of action.

        Plaintiffs again rely on *Doe* to argue that this Court should adopt *Doe*'s reasoning to read an

express cause of action into Title I of the Rehabilitation Act. *See* Doe Memo & Order. The *Doe*

court held that the language of the IDEA providing individuals with a private right of action was

broad enough to give parents of children with disabilities "the opportunity to file a complaint with

respect to *any matter* relating to the provision of a FAPE[14] to their children." *See id*. at 11.

_____

        [14]In the context of the IDEA, FAPE stands for "Free Appropriate Public Education,"
meaning the provision of special education and services at public expense in accordance with an
Individualized Education Plan ("IEP") designed to help a child receive educational benefit.

According to Plaintiffs, because Title I of the Rehabilitation Act includes an enforcement mechanism that is virtually identical to the enforcement mechanism under the IDEA, this Court should find that an express cause of action exists under Title I of the Rehabilitation Act.

The Court finds *Doe* distinguishable from the case sub judice. In holding that the IDEA provides an express cause of action for plaintiffs alleging widespread systemic deficiencies in a state's special education program, the *Doe* Court relied on decisions by "[t]he vast majority of other courts that have considered the issue [and] have concluded that the IDEA does provide either an express or implied cause of action for plaintiffs challenging state-wide violations of the IDEA." *See Doe* Memo & Order at 12-14. Further, the *Doe* defendants cited no precedent holding that the IDEA "[does] not create a private cause of action, either express or implied, for plaintiffs alleging systemic violations of the [IDEA]." *See id.* at 14-15. In this case, however, Plaintiffs can point to no precedent where courts have interpreted the language of §722(c)(5)(J) as allowing for a private cause of action for claims for *systemic relief.* Moreover, the pre-1998 amendment jurisprudence instructs that Title I of the Rehabilitation Act contains neither an express nor an implied private cause of action for individuals contesting their treatment under the Act. *See, e.g., Mallett*, 130 F.3d at 1245.[15]

The Supreme Court has held that if Congress expressly provides another remedy, i.e. an

---

[15]The Court notes that *Doe* does share some similarities with the instant case. For instance, in *Doe*, though defendants disputed the breadth of the express private cause of action available under the terms of the IDEA, they conceded that the statute creates an express cause of action. *See id.* at 10. Similarly, in this case, though Defendant admits that 29 U.S.C. § 722(c)(5)(J) provides an express cause of action for review of a hearing officer's final decision, Defendant asserts that Plaintiffs may not apply this limited clause to assert a claim that laws promulgated by ORSC violate the rights of all disabled individuals. But these similarities are easily outweighed by the aforementioned distinguishing factors.

administrative remedial scheme, a court should not add additional remedies.  *Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996).  In this case, a decision finding that Title I of the Rehabilitation Act contains an express private right of action would overlook Congress' intent to provide potential plaintiffs with a detailed administrative remedial scheme, and would, therefore, alter significantly the Act in direct contravention of the foregoing Supreme Court edict.  *Id*.  Moreover, there is no basis – precedential or statutory – that would warrant such a finding.  Accordingly, the Court finds that Title I of the Rehabilitation Act does *not* create a private cause of action for plaintiffs seeking systemic relief.

### b. Existence of an Implied Cause of Action

Finding, therefore, that 29 U.S.C. § 722 creates no express cause of action, the Court must now consider whether it creates an *implied* private cause of action.  The Supreme Court has long held that like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.  *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979) (remedies available are those "that Congress enacted into law").  In *Cort v. Ash*, the Supreme Court developed a four-factor inquiry to determine Congressional intent.[16]  *See*  422 U.S. 66, 78 (1975).  The four *Cort* factors are: (1) whether the plaintiff belongs to the class for which the statute was enacted; (2) the existence of legislative intent to create or deny a remedy; (3) consistency of such remedy with the purpose of the "legislative scheme"; and (4) classification of the cause of action as a state matter. *Id*.; *see e.g., Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979) (applying *Cort v. Ash* factoral

---

[16]The *Cort* implied right of action test was grounded in two separation of powers concerns: (1) the concern that interpreting a right of action into a statute without express language, usurps Congress' authority to set the limits of federal jurisdiction; and (2) the idea that implied right of action threaten the exclusivity of Congressional power to interfere with the lawmaking power of the sates.  *See Cannon*, 441 U.S. at 747 (Powell, J. dissenting).

analysis to find an implied private right of action under Title IX because: (1) the statutory language focused on a benefitted class; (2) the legislative history "plainly indicates" intent for private enforcement; (3) a private remedy would not frustrate the underlying purpose of the statutory scheme – it would in fact further it; and (4) the area of the law--namely civil rights--is not one typically left to the states).

In subsequent cases, however, the Supreme Court, further narrowed the *Cort* analysis to focus solely on the second factor – congressional intent to allow private suits. *See Karhalios v. Nat'l Fed'n of Fed. Employees, Local 1263*, 489 U.S. 527, 532 (1989) (noting that "'the ultimate issue is whether Congress intended to create a private cause of action.'" (quoting *California v. Sierra Club*, 451 U.S. 287, 293 (1981))). Further, the Supreme Court has noted that a determination of Congressional intent requires that courts examine the statutory text, analyze the purpose of the laws, and canvas the relevant legislative history. *See Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) (noting that in *Sandoval*, the Court's search for Congress' intent began and ended with the text and structure of Title VI); *see also, Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) (where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit under either 42 U.S.C. § 1983 or an implied right of action); *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 645-46 (1981) (refusing to imply a private cause of action in the Sherman Antitrust Act without clear congressional authorization to do so).

*Alexander v. Sandoval* establishes the Supreme Court's current "implied cause of action analysis" in detail. *See* 532 U.S. at 275. In *Sandoval*, plaintiffs, Alabama citizens, sued James Alexander, the director of the Alabama Department of Public Safety (the "Department") pursuant

to Sections 601 and 602 of Title VI of the Civil Rights Act of 1964 ("Title VI")[17], seeking to enjoin

the Department's decision to administer state driver's license examinations in English only. *See id*.

at 279. Plaintiffs argued that the English-only policy violated the DOJ regulation granting financial

assistance to the Department because it "had the effect of subjecting non-English speakers to

discrimination based on their national origin." *Id*. On certiorari to the Supreme Court, the sole issue

was whether Title VI includes a "private cause of action to enforce [the DOJ's regulation]." *Id*.

In conducting its inquiry, the Supreme Court began its search for congressional intent with

"the text and structure of Title VI." *See Sandoval*, 532 U.S. at 288-89. The Court found it

"immediately clear that the 'rights-creating' language so critical to the Court's analysis in *Cannon*

of § 601, is completely absent from § 602," the statutory section through which the Department

passed the regulation in question. *Id*. (citations omitted). Accordingly, the Court explained that

"[f]ar from displaying congressional intent to create new rights, § 602 limits agencies to

'effectuat[ing]' rights already created by § 601." *Id*. at 289. Further, the Court noted that § 602,

rather than focusing on the individuals protected, focused on the *person regulated*, creating "no

implication of an intent to confer rights on a particular class of persons." *Id*. (citing *California v.

Sierra Club*, 451 U.S. 287, 294 (1981)). The Court also noted that Congress' decision to lay out a

detailed administrative review process in § 602 suggests its intent to preclude other methods of

enforcement. *See id*. at 290 (citing *Karahalios v. Fed. Employees*, 489 U.S. 527, 533 (1989) (the

---

[17]Section 601 of Title VI prohibits discrimination based on race, color, or national origin in covered programs and activities. *See* 42 U.S.C. § 2000d. Section 602 of Title VI authorizes federal agencies to effectuate Section 601 by issuing regulations. 42 U.S.C. § 2000d-1. The Department of Justice ("DOJ"), in an exercise of this authority promulgated a regulation forbidding funding recipients to utilize criteria or administrative methods having the effect of subjecting individuals to discrimination based on the prohibited grounds. 28 C.F.R. § 42.104(b)(2); *see Sandoval*, 532 U.S. at 275.

express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others)).  The Court concluded its analysis by finding that Congress had *not* intended to create a private right to enforce regulations promulgated under Title VI.  *See id.* at 291.

In the instant case, this Court must determine whether in drafting Title I of the Rehabilitation Act, Congress intended for prospective plaintiffs to have a private cause of action to seek declaratory or injunctive relief for an alleged systemic violation.  As in *Sandoval*, the Court must begin its inquiry by determining whether in drafting the Act, Congress intended to allow for such an action to proceed.[18]  Beginning with the plain language of Title I of the Rehabilitation Act, this Court has previously found that there is no *express* cause of action for systemic relief existing under Section 722.  *See supra* Part IV.B.1.a..  Moreover, in analyzing the plain language of 29 U.S.C. § 722, it is clear that like Section 601 of Title VI, the statute does not contain the "rights-creating" language so critical to the Court's analysis.  *See Sandoval*, 532 U.S. at 288-89 ("Whereas § 601 decrees that '[n]o person . . . shall . . . be subjected to discrimination,' the text of § 602 provides that '[e]ach Federal department and agency . . . is authorized and directed to effectuate the provisions of [§ 601].'").

Though the plain language of the Rehabilitation Act points against implying a private cause of action, the Court must consider Congress' justification for drafting the Act.  The broad purpose of the Rehabilitation Act is both to empower disabled individuals and to create incentives for Federal and State governments to work together to promote such empowerment.  *See* 29 U.S.C. § 701.  Nowhere in the Act does Congress imply that individuals should be allowed to bring private

_____

[18]Plaintiffs assert that there is an *express* cause of action existing under Section 722. Because Plaintiffs rely on the existence of an express cause of action, in their Response, Plaintiffs present no argument to support an assertion that, in the alternative, an *implied* cause of action exists under Section 722.

causes of action for claims that a state receiving funds pursuant to the Act had passed laws that allegedly violated their statutory and/or Constitutional rights. Moreover, in 29 U.S.C. §§ 722 and 723, Congress sets forth a detailed remedial scheme in which individuals seeking to enforce their rights under the Act could pursue administrative, and later, civil actions. *See* 29 U.S.C. §§ 722(c)(5)(A)-(J). This detailed scheme augurs against a finding of congressional intent to imply a cause of action for plaintiffs suing for systemic relief. *See, e.g.*, *Sandoval*, 532 U.S. at 290-91. Without the presence of Congressional intent, this Court cannot now read such an action into the statutory language. Therefore, the Court finds that the Rehabilitation Act does not include a private right of action for plaintiffs seeking relief for systemic violations of the Act.

### c. Whether Federal Regulations Create a Private Cause of Action

Plaintiffs' Complaint also asserts its First Cause of Action under the auspices of 34 C.F.R. §§ 361.48, 361.50(a) & (c), and 361.54(b), federal regulations issued by the Department of Education ("DOE") pursuant to Title I of the Rehabilitation Act. Defendant asserts however, that individually enforceable rights "cannot be conferred upon an individual solely through federal regulations. They can only come from federal statutes." *See* Def.'s Motion at 13.

In *Sandoval*, the Supreme Court noted that regulations construe the statute, and it "is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute." *See* 532 U.S. at 184 (noting that "[a] Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.").[19] Under *Sandoval*, therefore, this Court must find that the regulations upon

_____

[19]Though the Sixth Circuit held in *Loschiavo v. City of Dearborn* that federal regulations could create rights that are individually enforceable under 42 U.S.C. § 1983, *Loschiavo* was decided before *Sandoval*, which makes clear that regulations are meant to construe statutes, not

which Plaintiffs rely do not create a private right of action through which they may assert their right to systemic relief under Title I of the Rehabilitation Act.

Therefore, finding that Title I of the Rehabilitation Act and its accompanying federal regulations create neither an express nor an implied cause of action for plaintiffs claiming systemic violations of Title I of the Rehabilitation Act, this Court **GRANTS** Defendant's Motions to Dismiss Plaintiffs' First Cause of Action for failing to state a claim on which relief can be granted.

**2. Third Cause of Action[20] -**
**Whether Plaintiffs, by way of 42 U.S.C. § 1983,**
**Have Stated a Claim that O.A.C.  §§ 3304-2-58(H) and (I) Conflict**
**with Federal Law and Violate Plaintiffs' Due Process Rights**

Plaintiffs' third cause of action asserts a claim under 42 U.S.C § 1983 that the Ohio college training rule and its accompany regulations abridge Plaintiffs' due process rights as provided by the Fourteenth Amendment of the Constitution.  Section 1983 provides a federal remedy for "the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws."  *See* 42 U.S.C. § 1983.  To prevail in this type of § 1983 claim, a prospective plaintiff must: (1) establish that the harm he suffered was caused by a constitutional violation; and (2) establish that the prospective defendants are responsible for that violation.  *See May v. Franklin County Com'rs*, 437 F.2d 579, 583 (6th Cir. 2006) (citing *Collins v. City of Harker Heights,* 503 U.S. 115 (1992)).

In their Complaint, Plaintiffs write, "the defendant's action, while acting under color of state

---

to create private causes of action.  *See* 33 F.3d at 548 (6th Cir. 1994).

[20]The Court notes that Plaintiffs' Amended Complaint mistakenly label's its Due Process Clause cause of action Plaintiff's "Fourth Cause of Action - O.A.C 3304-2-58(H) and (I) Conflict with Federal Law and is Invalid via Operation of the Supremacy Clause of the United States Constitution."  *See* Pls.' Amended Complaint at 31.  The Court, however, will disregard the Plaintiffs' labeling error in considering Plaintiffs' arguments.

law, of promulgating and implementing O.A.C. §§ 3304-2-58(H) and (I), due to its arbitrary nature,

violates the Due Process Clause of the 14th Amendment to the United States [Constitution] as

enforced through Section 1983 of Title 42, United States Code." *See* Pls.' Amended Complaint ¶

219.  In their Response, Plaintiffs clarified their due process claim, writing:

> In this case, the right to due process is related to the arbitrary nature of defendant's rule,
> which deprives the plaintiffs of a benefit to which they would be otherwise entitled under
> the law.  Among other arguments, the rule establishes a conclusive or irrebuttable
> presumption, which has been held to violate the due process clause. . . ["The Constitution'
> requires the Government to act on an individualized basis, with general propositions serving
> only as rebuttable presumptions or other burden shifting devices."

Plaintiffs' Response at 13.  Plaintiffs also elaborate on their argument in a footnote, writing:

> The presumption is that the plaintiffs are able to contribute to their own individualized   plan
> services based on the information in the FAFSA.  The FAFSA, however, is based on a
> formula that is unrelated to the plaintiffs actual ability to contribute, in that it considers
> resources (such as their parents' income) over which they have no control.  The rule provides
> no mechanism for plaintiff to rebut this presumption. . . [and] this rule fails to allow for
> consideration of individual circumstances.

*See id*. at 13, n.11.

It is undisputed that under the federal pleading requirements, a plaintiff's complaint must

include "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See*

FED. R. CIV. PRO. 8(a)(2).  The short and plain statement must "give the defendant fair notice of

what plaintiff's claim is, and the grounds upon which it rests."  *Id*.  A complaint must contain either

direct or inferential allegations with respect to all the material elements necessary to sustain a

recovery under some viable legal theory.  *Id*. (citations omitted).  Plaintiffs' Amended Complaint,

rather than giving Defendant fair notice of Plaintiffs' claim, makes a bare assertion that the college

training rule is "arbitrary."  *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993).  Though

Plaintiffs' elaborate on the substance of their claim in a footnote of their Response, the Court finds

that their Complaint has failed to state a claim upon which relief can be granted.  Hence, the Court

**GRANTS** Defendant's Motions to Dismiss Plaintiffs' Third Cause of Action, without prejudice,

granting Plaintiffs leave to amend their Complaint within twenty days of the issuance of this Opinion

and Order.

### 3. Fourth Cause of Action -
### Whether O.A.C.  §§ 3304-2-58(H) and (I) Conflict with
### Federal Law and are Invalid via Operation of the
### Supremacy Clause of the United States Constitution

The Supremacy Clause of the United States Constitution provides,

> [t]his Constitution, and the Laws of the United States which shall be made in Pursuance
> thereof; and all Treaties made or which shall be made, under the Authority of the United
> States, shall be the supreme Law of the Land; and the Judges in every State shall be bound
> thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. Art. VI, cl. 2.  Turning to Plaintiffs' Supremacy Clause claim, Plaintiffs assert that

O.A.C. §§ 3304-2-58(H) and (I) conflict with both Congress' objectives for developing the

Rehabilitation Act as well as various federal regulations promulgated under that act.  *See* Pls.'

Amended Complaint ¶ 221-23.  Specifically, Plaintiffs assert that the State laws conflict with 34

C.F.R. : (1) fail to consider *only* the financial situation of eligible consumers; (2) fail to ensure that

consumers' participation in the cost of vocational rehabilitation services is reasonable; (3) place so

high a burden on consumers seeking to receive vocational rehabilitation training through post-

secondary education as to effectively deny a necessary service; (4) place an arbitrary limit on the

nature of vocational services to be provided to consumers; (5) fail to consider disability-related

needs; (6) treat similarly situated individuals differently; and (7) set forth no mechanism and criteria

for waiver as required by federal law.  *Id*. ¶ 209.

Preemption can generally occur in three ways: (1) where Congress has expressly preempted

state law; (2) where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; or (3) where federal law conflicts with state law. *See Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) (citing *Barnett Bank of Marion County v. Nelson*, 517 U.S. 25, 31 (1996)).  This case indisputably involves "conflict preemption," which arises where a "state law arises as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *See id*.; *see, e.g., Townsend v. Swank*, 404 U.S. 282 (1971) (holding state law invalid by virtue of its conflict with federal Spending Clause legislation, but without reference to "preemption); *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 411, n.9 (1973) (noting that "preemption" is used "in a rather special sense" because the litigation addresses whether a state has gone too far in placing conditions on the receipt of federal funds rather than the "arguable federal preemption of a wholly independent state program dealing with the same or a similar problem."); *Jane Does I Through 4 v. State of Utah Dep't of Health*, 776 F.2d 253, 256 (10th Cir. 1985) (finding state parental consent conditions violated Title X, but noting that "[w]e do not see a preemption issue in this case"); *but see, Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 664, 661-68 (2003) (addressing the potential conflict between state statute and Medicaid as preemption question).

Although the vast majority of preemption cases involve situations in which Congress has exercised its power under the Commerce Clause, the present case is a situation dealing with a congressional exercise of the spending power, not the commerce power, and "the dynamics between preemption and Congress's reliance on the spending power differ appreciably from those applicable in the Commerce Clause context."  *See Planned Parenthood of Houston & Southeast Tex. v. Sanchez*, 403 F.3d 324, 330 (5th Cir. 2005) .  The Fifth Circuit has expounded on the difference

between Commerce Clause preemption claims and Spending Clause preemption claims, stating:

> the principal difference is that whereas preemptive legislation enacted under the Commerce Clause trumps state law throughout the United States *ex proprio vigore,* preemptive legislation enacted under the spending power presents states with a choice: they may either accept federal funds (and subject themselves to requirements imposed by federal law) or decline such funds (and avoid the necessity of abiding by those requirements).

*Id.*

Though courts are split on the issue,[21] the growing consensus of courts is to analyze such claims under the traditional preemption doctrine. *Planned Parenthood of Houston & Southeast Tex.,* 403 F.3d at 330, n.21 (citing *Pharm. Research & Mfrs. of Am.,* 538 U.S. at 661-68 and *Lawrence County v. Lead-Deadwood Sch. Dist. No. 40-1,* 469 U.S. 256, 259, n.6 (1985)). Under the traditional preemption doctrine, the Court begins with "a presumption that the state statute is valid, and [then asks] whether petitioner has shouldered the burden of overcoming that presumption." *See id.* at 336.

---

[21]In similar conflict preemption cases, some courts have proceeded without invoking preemption. *See, e.g., Jane Does 1 Through 4 v. State of Utah Dep't of Health,* 776 F.2d 253, 256 (10th Cir.1985) (finding state parental consent conditions violated Title X, but noting that "[w]e do not see a preemption issue in this case"). Other courts have "expressed ambivalence" as to whether preemption is at issue. For instance, in *Planned Parenthood Ass'n of Utah v. Dandoy,* the Tenth Circuit explained:

> It would not seem to be of any consequence whether this is described as "preemption" in the sense used in the traditional doctrine, or as an application of the Supremacy Clause to the administration of state-federal programs derived from the voluntary nature of state participation in the programs. The latter is a more realistic treatment. . .

> If the [state chooses] to participate, there is thereby accepted a limitation or restriction on state statutes or regulations which conflict with the federal statutes. This has consequences similar to the traditional preemption doctrine but as mentioned they come about by a choice made by the state.

*See* 810 F.2d 984, 988 (10th Cir.1987)

"The mere fact that a state program imposes an additional 'modest impediment' to eligibility for federal funds does not provide a sufficient basis for preemption.  However, a state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause." *Id*. at 337.

The Court finds Plaintiffs' Fourth Cause of Action too vague to state a claim on which relief can be granted.  Though Plaintiffs argue that the college training rule is preempted by federal law, beyond their vague assertion, they fail to address adequately the aspects of the Rehabilitation Act and its federal regulations that allegedly conflict with the rule.  Therefore, the Court finds that Plaintiffs' Fourth Cause of Action cannot survive Defendant's Motion to Dismiss.  The Court **GRANTS** Defendant's Motion to Dismiss Plaintiffs' Fourth Cause of Action, without prejudice, granting Plaintiffs leave to amend their Complaint within twenty days of the issuance of this Opinion and Order.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's various Motions to Dismiss for failure to state a claim on which relief can be granted.  The case is hereby dismissed, without prejudice, and the Court grants Plaintiffs leave to amend their Complaint to address certain pleading deficiencies in their Third and Fourth causes of action within twenty days of the issuance of this Opinion and Order.

**IT IS SO ORDERED.**

    **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: July 20, 2006**

-40-